Filed: December 13, 2012

IN THE SUPREME COURT OF THE STATE OF OREGON

In the Matter of V. N. W.
and C. A. W., Children.


DEPARTMENT OF HUMAN SERVICES,

                                        Respondent on Review,

        v.

G.  D. W.,

                                        Petitioner on Review.

(CC 098109J1, 098109J2; CA A147584; SC S059950)

En Banc

On review from the Court of Appeals.*

Argued and submitted September 20, 2012.

Angela Sherbo, Youth, Rights and Justice, Portland, argued the cause and filed the briefs for petitioner on review.

Inge D. Wells, Senior Assistant Attorney General, Salem, argued the cause for respondent on review. With her on the brief were Ellen Rosenblulm, Attorney General, and Anna M. Joyce, Solicitor General.


Margaret McWilliams, Sisters, filed a brief on behalf of *amici curiae* Oregon Law Professors (Leslie Harris, Carrie Leonetti, and Tom Lininger).


DE MUNIZ, J.

The decision of the Court of Appeals is reversed. The judgments of the juvenile court are reversed, and the case is remanded to the juvenile court for further proceedings in accordance with this opinion.

*Appeal from Lincoln County Circuit Court, Philip L. Nelson, Judge. 246 Or App 66, 264 P3d 205 (2011).

DE MUNIZ, J.

In this juvenile dependency proceeding, a father was found by the court to have subjected one of his children to sexual abuse. Although the child was unavailable to testify at the proceedings, the juvenile court admitted into evidence child's out-of-court statements. Father contends that the juvenile court's theory for admitting the statements -- that they were the statements of a party-opponent and, therefore, not hearsay -- betrayed a fundamental misunderstanding of the evidence rule pertaining to statements of party-opponents, OEC 801(4)(b)(A). Father also argues that the court's admission of child's out-of-court statements under OEC 801(4)(b)(A) violated his (father's) right to due process and to a proceeding that was fundamentally fair. We agree with father that the juvenile court erred in admitting the child's statements under OEC 801(4)(b)(A), and we conclude that the error was not harmless. Accordingly, we reverse the judgments that incorporate the problematic findings and remand to the juvenile court.

FACTS

After a verbal and physical altercation with father, mother left the family's home in Lincoln County with the couple's two children -- four-year-old V and six-month-old C -- and went to the police to report that father had assaulted her and that he had sexually abused V. Mother also provided police with evidence that father was keeping a quantity of cocaine in a safe at his place of business. Based on mother's allegations and the evidence that she had supplied, the police went to the family's home, arrested father, and took him to jail.

1

The next day, a police detective, Miller, and a child protective service worker, Page, interviewed mother and V about the sexual abuse allegation. In response to Page's questions, V indicated that father had touched her vaginal area with his hand. Page instructed mother that staff from the Department of Human Services (DHS) would contact her and that she should not allow V or C to have contact with father.

Two weeks later, V was interviewed at the Lincoln County Child Advocacy Center. In a taped interview, V told an interviewer that father had "touched [her] flower."[1] In response to specific questions, V stated that father had touched her with "four fingers" "inside" her "flower" and that he had touched her "one time." A physical examination performed at the Advocacy Center produced no physical evidence of sexual abuse.

Mother remained in the family home with V and C, and obtained a restraining order prohibiting father from contacting them. Father, who had been charged criminally with assault, sexual abuse, and other crimes, remained in jail for a number of months. While father was in jail, he wrote three letters to mother; in one of those letters, he asked mother to withdraw the charges of sexual abuse. Mother insisted that she did not read two of the letters and that she read only a part of the third.

Several months after the initial report to police, Page, the child protective services worker, went to V's school to interview V after a teaching assistant reported to DHS certain disquieting statements that V had made to another child. In the interview, V

---

[1] V apparently learned from her mother to use the word "flower" to refer to her vagina.

2

told Page that "my dad didn't touch me; I lie[d]," but also told Page that "my mom told me that I lied," and that "my momma said if I say I lie[d], dad can come home." About the same time, mother informed the police and DHS that she had lied about father sexually abusing V and that she had coached V to tell third parties that father had touched her "flower." Page and other DHS staffers became concerned that mother no longer was motivated to protect V and C from father. Page had the children taken into protective custody and then placed into foster care. DHS thereafter filed the dependency petitions (one for each child) that are at the center of the present case.[2]

The dependency petitions alleged that (1) mother had failed to provide the children with the necessary care, guidance, supervision and protection, and lacked the skills and motivation needed to assure their safety; and (2) father had engaged in domestic violence, drug and alcohol abuse, and sexual abuse of V, and that that history made the children unsafe in his care. Mother immediately stipulated to the court's jurisdiction over her and the children and she began to receive services from DHS. The juvenile court postponed the adjudication of the dependency petition with respect to father until after the criminal case against father was resolved.

The criminal charges against father ultimately were dismissed after mother

---

[2] After V was removed from her mother's home, she was taken to the Children's Advocacy Center for another interview. When questioned about not wanting to live with her father, she responded that her father "doesn't be nice" and that "[h]e touched my private." This time she told the interviewer that father had touched her "outside" her private part but, consistent with the earlier interview, said that the touching had happened "one" time.

testified that the alleged assault on her had been a mutual affray and that she had concocted the sexual abuse story and had coached V to confirm the story because she had been angry at father.[3] Thereafter, the juvenile case was scheduled for trial. In that proceeding, the court was required to determine (1) the court's jurisdiction over V and C *vis-à-vis* father; (2) a permanency plan for the children *vis-à-vis* mother; and (3) the merits of the state's request for an "aggravated circumstances" finding against father, which would relieve DHS of its obligation to make reasonable efforts to make it possible to return the children to father's care.[4]

Before the scheduled trial, the state moved for a ruling on the admissibility of V's out-of-court statements to various third parties regarding alleged sexual abuse by her father. The state asserted in the motion that, although it did not intend to call V as a witness in the proceeding,[5] V's out-of-court statements could and should be received into evidence nonetheless because, in accordance with the Court of Appeals decision in *State*

---

[3] The trial court in the criminal case found that V was not competent to testify.

[4] ORS 419B.340(1) requires a juvenile court to include in any disposition order concerning a child who has been removed from the family home a determination as to whether DHS has made reasonable and active efforts to make it possible for the child to return home. ORS 419B.340(5)(a) provides that, when a juvenile court determines that certain specified "aggravated circumstances" exist, it may make a finding that DHS is not required to make such "reasonable efforts." In the present case, the state sought an "aggravated circumstances" finding under ORS 419B.340(5)(a)(D), *i.e.*, a finding that "[t]he parent has subjected any child to rape, sodomy or sexual abuse."

[5] In fact, the juvenile court had ruled -- in response to a question that father had raised in an earlier pretrial status proceeding -- that V was not competent to testify in the juvenile proceeding.

4

*ex rel Juv. Dept. v. Cowens*, 143 Or App 68, 922 P2d 1258, *rev den,* 324 Or 395 (1996), the statements were admissible as the statements of a party opponent under OEC 801(4)(b)(A). In response, father argued that *Cowens* was inconsistent with the theory underlying OEC 801(4)(b)(A), that *Cowens* was wrongly decided, and that, in any event, the admission of V's out-of-court statements when father could not cross-examine her violated his constitutional right to a fundamentally fair proceeding. Father suggested that, if the state wished to offer V's statements, it must proceed under OEC 803(18a)(b),which provides an exception to the rule against hearsay for out-of-court statements of an unavailable child witness "concerning an act of abuse," but "only if the proponent establishes that the time, content and circumstances of the statement provide indicia of reliability." The juvenile court ruled that the statements were admissible as nonhearsay under OEC 801(4)(b)(A), and the state did not attempt to show that the statements would be admissible under the hearsay exception that father had identified.

At the ensuing dependency hearing, the state presented V's out-of-court statements about the alleged sexual abuse through V's videotaped interviews at the Child Advocacy Center and the testimony of three witnesses – child protective service worker Page, police detective Miller, and Saunders, a family friend. The court also heard the testimony of various police officers, social service workers, and friends, to whom *mother* had reported the sexual abuse of V; mother's testimony that she had concocted the story about the sexual abuse, told it to others, and coached V; and the testimony of various psychologists, counselors, and experts.

5

Based on the foregoing evidence, the juvenile court issued a lengthy letter opinion that contained, among other things, an express finding that "father did at least one time place his fingers inside [V's] vagina." The court subsequently issued two judgments that incorporated the finding that father had sexually abused V. One judgment determined that V and C were within the jurisdiction of the juvenile court with respect to father (as noted above, mother previously had stipulated to jurisdiction). The other judgment found that "aggravated circumstances" existed, such that DHS was not required to make reasonable efforts to reunify V and C with father. The court continued the existing permanency plan with respect to mother -- substitute care, supervised visitation with the children, and services designed to improve mother's parenting skills -- for an additional 120 days.

Father appealed to the Court of Appeals, arguing that the juvenile court erred in admitting V's out-of-court statements under the OEC 801(4)(b)(A), as interpreted and applied in *Cowens*, 143 Or App 68. The Court of Appeals rejected father's argument that *Cowens* was wrongly decided and concluded that V's out-of-court statements had been properly admitted. *Dept. of Human Services v. G. D. W.*, 246 Or App 66, 69-70, 264 P3d 205 (2011). We allowed father's petition for review.

During the pendency of father's appeal in this case, V and C have been returned to mother's physical custody (but remain in DHS's legal custody). At some point, mother filed a separate child support and custody action in Lincoln County Circuit

Court,[6] which alleged, among other things, that father should not be granted any visitation with the children because of the sexual abuse findings in the juvenile court's jurisdictional and aggravated circumstances judgments. The custody and child support case was consolidated with the juvenile case, and the court ultimately issued a stipulated judgment in the custody and child support case that awarded sole custody of V and C to mother with no parenting time to father. A few months later, the state moved to dismiss the juvenile court's wardship over V and C and to terminate DHS's custody. The juvenile court granted the motion on April 4, 2012 -- one day before this court allowed father's petition for review in the juvenile dependency case.

A preliminary question arises out of the juvenile court's granting of the state's motion: Does the fact that the juvenile court has ended its jurisdiction over V and C render father's petition for review moot? The state contends that it does because the release of V and C from the court's jurisdiction makes it is impossible for this court to grant father effective relief. *See Hamel v. Johnson*, 330 Or 180, 184, 998 P2d 661 (2000) (quoting *Greyhound Park v. Ore. Racing Com.*, 215 Or 76, 79, 332 P2d 634 (1958); case becomes moot when an event occurs that "render[s] it impossible for court to grant effectual relief"). In that regard, the state observes that the ordinary remedy for the error that father claims would be reversal and remand for a new jurisdictional hearing -- a remedy that is not available, given that the juvenile court has determined that the children no longer need its protection.

---

[6] Mother's and father's marriage had been annulled.

7

We conclude that, although the order terminating DHS's custody and dismissing the juvenile court's jurisdiction over the children complicates the issue of relief, it does not render moot father's challenge to the jurisdictional and aggravated circumstances order. As a general rule, a case becomes moot when the court's decision no longer will have a practical effect on the rights of the parties. *Brumnett v. PSRB*, 315 Or 402, 406, 848 P2d 1194 (1993). Father argues, and we agree, that the judicial finding that father sexually abused V, which is incorporated into the juvenile court's jurisdictional and aggravated circumstances judgments and, as such, is a matter of record, can have real and adverse effects on father, and that those adverse effects may be prevented if the findings are judicially overturned. For example, as long as the judicial finding and judgment that father sexually abused V are in effect, the state more easily can terminate father's parental rights to V and C and any other children he might have in the future. *See* ORS 419B.502 (rights of parent may be terminated without any effort by social service agency to help parent adjust his or her conduct if court finds that parent is unfit by reason of a single incident of "extreme conduct toward any child"). Moreover, the court's custody and parenting time decision likely was premised on the sexual abuse findings that the court incorporated into the jurisdictional and aggravated circumstances judgments. If the findings and judgments were to be vacated, father's ability to reopen the custody and parenting time judgment might be positively affected. Finally, although perhaps not sufficient by itself to create a justiciable controversy, the social stigma that father suffers as a result of the judicial finding that he sexually abused his daughter is

8

significant. We therefore conclude that a decision in this case would have a practical effect on father's rights and prospects, and that father's petition for review is not moot. We turn to the merits.

As described above, based on the Court of Appeals decision in *Cowens*, 143 Or App 68, the juvenile court concluded that V's out-of-court statements were admissible nonhearsay. In *Cowens*, the Court of Appeals held that, in dependency proceedings, the subject child's out-of-court statements are admissible nonhearsay under OEC 801(4)(b)(A), which provides, in part:

"(4) A statement is not hearsay if:

"* * * * *

"(b) The statement is offered against a party and is:

"(A) That party's own statement, in either an individual or a representative capacity."

In *Cowens*, the state had petitioned for wardship of a 13-year-old girl based on her report that her father had been sexually abusing her over a number of months. In the dependency proceeding that ensued, the state sought to introduce, over the father's objection, an audiotaped police interview with the daughter, in which she detailed the alleged abuse. The juvenile court admitted the recorded interview under OEC 801(4)(b)(A). The state ultimately prevailed in the proceeding, and the father appealed, challenging the admission of his daughter's out-of-court statements. The Court of Appeals held that the statements were properly admissible under OEC 801(4)(b)(A), as statements by the daughter offered against the daughter. 143 Or App at 71-72.

The key question in *Cowens* was whether, in a dependency proceeding like the one at issue in that case, the state could be said to be offering the out-of-court statement of the subject child "against" the child.[7] The Court of Appeals concluded that, regardless of how a child might perceive his or her position *vis-à-vis* the state, the state is always, in some sense, the child's opponent in a dependency proceeding:

> "When the state files a dependency petition to make the child a ward of the court, it seeks to interfere with the parent-child relationship and therefore to infringe on the child's interest in that relationship. In that sense, the state's position is adverse to the child, and evidence presented by the state to establish jurisdiction is offered 'against' the child. That conclusion is not altered by the fact that [the daughter in the case] sought the protection of the State Offices for Services to Children and Families (SOSCF) and apparently believed that the agency was 'on her side.' Although a child in a particular case may share an interest with the state in being protected from a sexually abusive home environment, it simply cannot be said that the state represents *all* of the child's interests."

143 Or App at 72 (footnote omitted; emphasis in original). As to whether the child's statements also were admissible against the father, who had no part in them, the court appeared to assume the answer was "yes":

> "We believe that when the state seeks to interfere with the parent-child relationship -- either permanently in a termination proceeding or temporarily in a dependency proceeding -- the child has interests adverse to the state. As such, the state's evidence is offered not only against the parent, but also against the child."[8]

---

[7] There is no question that the child is a "party" to a dependency proceeding. ORS 419B.875(1)(a)(A).

[8] In a later case, *State ex rel Dept. of Human Services v. Meyers*, 207 Or App 271, 140 P3d 1181, *rev den* 341 Or 450 (2006), the Court of Appeals, in a proceeding to terminate a mother's parental rights to her children, affirmed the juvenile court's admission of the out-of-court statement of one of her children under the "statement of a party opponent" rationale.

10

*Id.*

In the present case, the state adopts the reasoning of *Cowens*. It argues that the broad view of party alignment and opposition that *Cowens* promotes is necessary in the "unique" context of juvenile dependency proceedings because, in such proceedings, the parties are never "against" each other in the traditional "pleadings" sense and because the state's primary objective in juvenile dependency cases -- protecting the welfare of the child -- causes it to be aligned with the child's interests in certain respects, but opposed to the child's presumptive interest in maintaining the parent-child relationship. Thus, the state appears to propose that, when OEC 801(4)(b)(A) refers to a statement being offered "against" a party, it is referring not only to ordinary notions of party opposition that are based on the positions that the parties have announced in their pleadings, but also to a theory of opposition that is based on how the parties' presumed "interests" are aligned within the structure of the litigation.

The first question for this court, then, is whether that interpretation of OEC 801(4)(b)(A) is consonant with the legislature's intent when it adopted the rule.[9] To determine the legislature's intent, we employ the methodology announced in *State v. Gaines*, 346 Or 160, 172-72, 206 P3d 1042 (2009); that is, we examine the text and context of the rule and any legislative history that appears to be helpful. The text of the rule is uninformative in that regard: The phrase "offered against a party" does not specify

---

[9] "The provision we identify as OEC 801 in fact is a statute, adopted by the legislature at Oregon Laws 1981, chapter 892, section 62, and codified at ORS 40.450.

how the suggested opposition must manifest itself. There are no readily apparent contextual clues. Legislative history, however, is somewhat more helpful. The Legislative Commentary on the Oregon Evidence Code, which this court considers to be part of the Code's legislative history,[10] explains that, although admissions of a party opponent previously had been considered hearsay admissible under an exception to the hearsay rule, OEC 801(4)(b)(A) treated such admissions as admissible nonhearsay, "on the theory that their admissibility is the result of the *adversary system* rather than satisfaction of the conditions of the hearsay rule." Legislative Commentary to OEC 801, *reported in* Laird C. Kirkpatrick, *Oregon Evidence* §801.03[2], Art VIII-28 (4th ed 2002) (emphasis added). In support of that point, the Legislative Commentary cites three sources: "Strahorn, *A Reconsideration of the Hearsay Rule and Admissions*, in U Pa L Rev 564 (1937); Morgan, Basic Problems of Evidence 265 (1962); 4 Wigmore § 1048." Legislative Commentary at Art VIII-28.

One of those sources, Morgan, provides a slightly more expansive explanation of the Legislative Commentary's reference to the "adversary system":

"The admissibility of an admission made by the party himself rests not upon any notion that the circumstances in which it was made furnish the trier [of fact] means of evaluating it fairly, but upon the adversary theory of litigation. A party can hardly object that he had no opportunity to cross-examine himself or that he is unworthy of credence save when speaking under sanction of oath."

Edmund M. Morgan, *Basic Problems of Evidence* 266 (1962 ed). That explanation

---

[10] *See State ex rel OHSU v. Haas*, 325 Or 492, 506 n 10, 924 P2d 261 (1997) (stating that Legislative Commentary on the Oregon Evidence Code should be considered part of legislative history).

12

suggests that, when the Legislative Commentary to OEC 801(4)(b)(A) states that the rule is based on the "adversary system," it is acknowledging that the purpose of the hearsay rule -- to ensure that parties can test all the testimony against them through cross-examination -- is not relevant when the testimony is the party's own.

The other two cited sources -- Strahorn and Wigmore -- also focus on the adversary process. However, they discuss the nonhearsay status of admissions of party opponents in terms of "inconsistency" between such statements at issue and the party's contentions at trial. According to those sources, the choice to treat a party's prior out-of-court statements as nonhearsay, if offered against the party, derives, at least in part, from the idea that a party's out-of-court statements that are *inconsistent* with the party's present contentions have probative value that has nothing to do with whether there has been a fair opportunity to test the trustworthiness of the statements through cross-examination, but flows instead from the very fact of inconsistency. According to their theory, a party's statement is deemed to be offered *against* that party only if the statement is inconsistent with the party's present contentions, as expressed in the party's pleadings and the testimony on which the party relies on to support those pleadings. *See* John S. Strahorn, *A Reconsideration of the Hearsay Rule and Admissions*, 85 U Penn L Rev 564, 573 (1937) ("[T]he unfavorable verbal conduct of a party litigant may be offered against him because of the circumstance of the inconsistency with the validity of his present contention by pleading"); John H. Wigmore, 4 Wigmore on Evidence § 1048 at 4-5 (Chadbourn rev 1972) ("[A]nything said by the party-opponent may be used against him

13

as an admission, provided it exhibits the quality of inconsistency with the facts now asserted by him in pleadings or in testimony.").[11]

The Legislative Commentary to OEC 801(4)(b)(A), and the three sources that it cites, suggest two points about what the legislature's intent in enacting the phrase "offered *against* a party." First, insofar as the rule purportedly is rooted in the "adversary process," it appears to require that the party whose statement is at issue be actively engaged in that process *as an adversary* for one side. The logic of truth seeking through the adversarial system fails when one or both of the "parties" have not declared for one side or the other, and are only presumed to have "interests," even conflicting interests, in the matter being decided. Second, the citations to Strahorn and Wigmore suggest that the notion of party opposition that the legislature had in mind is the notion that those two commentators discussed – that is, opposition that derives from the parties' pleadings and other *overt* contentions at trial.

We think it is clear from the Legislative Commentary that when OEC 801(4)(b)(A) refers to an out-of-court statement being offered "against" a party, it means that the statement is offered against a position that the party actually has declared in the

---

[11] Wigmore contends that, although "the quality of inconsistency with the facts now asserted" is a necessary proviso of the rule admitting statements of a party-opponent, "[t]his proviso never needs to be enforced, because no party offers his opponent's statement unless it does appear to be inconsistent." 4 Wigmore on Evidence § 1048 at 4. Wigmore apparently did not foresee a situation like the present one, where the state seeks to designate a child with whom it is *aligned*, for purposes of protecting the child from a parent it views as abusive, as an *opponent*, for purposes of the rule pertaining to admissions of party-opponents. Wigmore's assumption that the requirement of inconsistency need never be enforced clearly does not operate in this context.

14

proceeding, by pleadings or otherwise. We reject the Court of Appeals' suggestion in *Cowens* that the rule also applies when some presumed "interest" of an *un*declared party is in conflict with the proffered statement itself or the position of the party who offers it.

The state contends that, in the unique circumstances of a juvenile dependency proceeding, where the case is "about" a child and none of the parties are "opposed" to one another in the pleading sense,

> "the only application of OEC 801(4)(b)(A) that is workable * * * is the one established in *Cowens*; that a child always has interests adverse to the state, and that the state may offer the child's out-of-court statements against her."

That argument, however, depends on an unwarranted assumption -- that there is some necessity that the "admissions of a party opponent" rule be "workable" in the juvenile dependency context, *i.e.*, that it must provide a basis for admission of a child's out-of-court reports of abuse. Furthermore, it is far from clear that OEC 801(4)(b)(A) *is not* workable in the juvenile dependency context. A child who is the subject of a juvenile dependency proceeding is considered a party to the proceeding and has the rights of a party -- including the right to appear with counsel, the right to request and participate in hearings, the right to call witnesses, and the right to appeal. ORS 419B.875(1)(a)(A), (2). Although it is true that the child rarely, if ever, would enter anything equivalent to a pleading, the child can stake out a position on the issues before the court in the same way that any other party to the proceeding would -- through opening statements and closing arguments, and by offering testimony and other evidence to prove or disprove the

15

allegations in the petition.[12] If the state can show that the child has, through those devices, declared a position on the issues before the court that is adverse to the allegations in the dependency petition, then the state, as the proponent of those allegations, may offer the child's out-of-court's statements *against the child* under OEC 801(4)(b)(A).[13] But, in the absence of evidence that the child has taken an adverse position, there can be no claim that he or she is a party-opponent and, thus, no basis for admitting his or her statements under the rule.

In the present case, the state sought to prove that the allegations of sexual abuse in the dependency petition and the "aggravated circumstances" motion were true and therefore V was within the court's jurisdiction and that "aggravating circumstances" existed that would relieve DHS of its obligations to father. Father opposed the state's position: He presented testimony and argument against the sexual abuse (and other) allegations. V, through her attorney, did not present a case for her own part. In their opening remarks, neither V's attorney nor V's Court Appointed Special Advocate (CASA) took a position on the question whether the sexual abuse charged in the petition

---

[12]  Generally, unless the child were of an age or level of maturity to decide for himself or herself, counsel for the child would determine what position, if any, the child should take in a juvenile dependency proceeding.

[13]  Moreover, the state always may attempt to offer a child's out-of-court statement about "an act of abuse" under OEC 803(18a)(b) -- although it must then also make a reliability showing that is not required when a statement qualifies as nonhearsay under OEC 801(4)(b)(A). Here, father suggested in the juvenile proceeding that the state might seek admission of V's statements under OEC 803(18a)(b), but the state chose to rely entirely on OEC 801(4)(b)(A).

16

and the "aggravated circumstances" alleged in the state's motion *actually* had occurred.[14]

In closing remarks, V's attorney and V's CASA asserted that they did not believe mother's recantation -- and, to that extent, suggested that child was aligned with the state's position on the sexual abuse allegation. There is nothing in the record that would support a conclusion that V took a position in the proceeding that was adverse to the state on the allegation that father had sexually abused V. As a result, the statements at issue were not admissible against V under OEC 801(4)(b)(A), and there is no argument that they were separately admissible against father under that rule.[15] The trial court's admission of V's out-of-court statements was error.

The state contends that we should affirm the challenged judgments nonetheless because the error in admitting the statements was harmless. Evidentiary error is considered harmless and is not a basis for reversal "if there is little likelihood that the particular error affected the verdict." *State v. Davis*, 336 Or 19, 32, 77 P3d 1111

---

[14] In his opening remarks, V's lawyer stipulated, on V's behalf, to an allegation in the petition that V "*believe[d]* the father is physically, sexually or emotionally abusive to her and her mother, making the children unsafe * * * and the father requires help from the court and the state to adequately and appropriately parent the children." (Emphasis added.) On that basis alone, V's lawyer argued that V and her sister should be found to be within the jurisdiction of the court because V clearly would need the assistance of the state in dealing with the outfall from that belief.

[15] The state's entire theory for admitting the statements against father (consistently with *Cowens*) depends on their admissibility against V under OEC 801(4)(b)(A). Having concluded that the statements were not admissible against V under OEC 801(4)(b)(A), we need not consider father's and *amicis'* further arguments that their admission against father was contrary to the rule and violated father's constitutional rights.

(2003). The state contends that that harmless error rule is operative here because, even if the juvenile court had excluded V's out-of-court reports of sexual abuse, it still is likely that the court would have found that father had sexually abused V. The state argues that, in finding that father had sexually abused V, the juvenile court relied in large part on out-of-court statements *by mother* that she had observed the abuse, and on its own assessment that mother's in-court recantation of those statements was not credible.

However, the state's analysis of the juvenile court's reasoning is incomplete. Although the court announced in its letter opinion that it believed mother's initial reports about the sexual abuse and disbelieved her recantation, it also announced, immediately thereafter, that it also had relied on V's out-of-court statements:

> "I do not believe [V] would be able to repeat the abuse report to as many people as she did in a consistent manner if the story was planted within hours of her reporting it. Despite [father's expert's] discounting the consistency of the child's statements, the fact that she maintained the same theme of what happened when being appropriately interviewed is a strong piece of evidence."

In fact, the court made it clear that V's statements were important, perhaps essential, to its conclusion that the alleged sexual abuse actually had occurred:

> "If [V's] statements varied in different interviews or settings, then I would question whether the abuse happened or was planted by mother. * * * Considering all the pieces together, the petitioner has established the allegations in the second amended petition by a preponderance of the evidence."

In light of those comments, we cannot agree with the state's assertion that there is little likelihood that V's erroneously admitted out-of-court statements influenced the juvenile court's ultimate decision on the allegations that father had sexually abused V.

18

The error in admitting those statements was not harmless.

It follows that the two judgments at issue, both of which incorporate a finding that father sexually abused V, must be reversed and remanded to the juvenile court. On remand, the juvenile court should vacate its letter opinion dated December 18, 2010, and determine anew whether, without V's inadmissible out-of-court statements, the state has proved the allegations of sexual abuse of V by father. If it concludes that the state has not done so, it must vacate the "Aggravated Circumstances Judgment" and modify the "Jurisdictional Judgment" to remove the sexual abuse finding and order. If the court concludes that the state has proved the allegations of sexual abuse of V by father, it may draft a new letter opinion that supports that conclusion and reenter the original judgments.

The decision of the Court of Appeals is reversed. The judgments of the juvenile court are reversed, and the case is remanded to the juvenile court for further proceedings in accordance with this opinion.